James E. ALLEN, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 90–CA–938–MR.

Court of Appeals of Kentucky.

Oct. 25, 1991.

John Tim McCall, Louisville, for appellant.

Frederic J. Cowan, Atty. Gen., Ann Louise Cheuvront, Asst. Atty. Gen., Frankfort, for appellee.

Before LESTER, C.J., WILHOIT, Judge, and STEPHENS, Special Judge.

LESTER, Chief Judge.

This is an appeal from a judgment entered upon a jury verdict convicting appellant of driving while under the influence of intoxicants and sentencing him to thirty days confinement and imposing a fine of $500.

Although Allen claims by way of brief that he also appeals from an order denying him a new trial, the real basis of his arguments is found in his motion to suppress the results of a preliminary breath test and a blood alcohol test. Neither party contests the underlying factual background which is very succinctly set forth by Judge Potter in his opinion and order dealing with the motions. Being unable to improve thereon, we adopt it as our own and borrowing therefrom:

## BACKGROUND

Mr. Allen was one driver in a two-car accident. The other driver died. Mr. Allen has been indicted for Murder and Driving Under the Influence.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Allen was arrested at the scene for Driving Under the Influence and taken to the jail where he refused a Breathalyzer Test. Using the results of the Alco Sensor III Test and other evidence, the police obtained a search warrant to take a blood sample from Mr. Allen, which was later tested for alcohol. Mr. Allen has moved to suppress the result of both the blood test and the Alco Sensor III Test.

## THESE MOTIONS

Mr. Allen moves to suppress the results of the Alco Sensor III Test on the grounds that

(a) the test was the result of an illegal search and seizure because Mr. Allen was given no warning before the breath sample was taken, and

(b) the Alco Sensor III is too unreliable to be received into evidence.

He moves to suppress the results of the blood tests on the grounds that

(a) the blood sample was taken using a search warrant obtained on the basis of evidence collected in an illegal search (the Alco Sensor test results), and

(b) the blood sample was destroyed after he had requested an independent test but before he had an opportunity to test it.

## ALCO SENSOR III

The circumstances surrounding the administration of the Alco Sensor III test are not seriously in dispute.

In the early evening of February 16, 1989, Mr. Allen was driving a van that was involved in an accident on an interstate with a pickup truck driven by Mr. Graves. Mr. Allen was not seriously injured and was able to walk about after the accident. Mr. Graves was thrown from his truck and died on the pavement at the scene.

The police arrived on the scene shortly after the accident and began to assist and then investigate. EMS arrived a short time later. After being asked a few questions, Mr. Allen was placed in the back seat of a police car.

A Corrections Cabinet employee doing home incarceration checks was in the area heard the initial call on the police radio and went to the scene to assist. At the scene, he informed a police officer that he had a Alco Sensor III and could give Mr. Allen a test. The police asked him to do so. He approached Mr. Allen who was waiting in a police car, and asked Mr. Allen if he had been drinking, Mr. Allen stated he had not. The Corrections officer then asked him to take an Alco Sensor III test by blowing into the machine. Mr. Allen took the test, registering a .16.

Mr. Allen voluntarily gave his breath sample. Mr. Allen concedes he would not be entitled to a warning unless he were in police custody. The Court finds he was not in custody at the time the sample was given.

The court overruled all the motions.

■ In his first contention surrounding the PBT, Allen attacks its reliability. In so doing, he fails to make any reference to what authorizes its use, namely, KRS 189A.100(1) to the effect:

Law enforcement agencies may administer preliminary breath tests using devices or equipment which will ensure an accurate determination of blood alcohol content. Such tests may be administered in the field to a person suspected of violation of KRS 189A.010 before the person is arrested. This test may be administered in addition to any other blood alcohol level test authorized by law. A person's refusal to take a preliminary breath test shall not be used against him in a court of law or in any administrative proceeding.

Using *Marcum v. Commonwealth*, Ky., 483 S.W.2d 122 (1972), as to reliability of the device and *Owens v. Commonwealth*, Ky., 487 S.W.2d 897 (1972), dealing with operator training, appellant seeks to have us bar the use of the PBT results. Other than the fact that these cases dealt with a different type of machine, namely, the breathalyzer, we find nothing therein conflicting with the conclusions reached by the trial court. Keeping in mind that we are dealing with the Alco Sensor III, there is an abundance of evidence in this record to demonstrate that the device is most reliable. Not only has it won approval by the U.S. Department of Transportation/National Highway Safety Administration, but its reliability has been clearly established in this jurisdiction by some 1396 tests conducted over a year and a half in some eight counties, both urban and rural. The individual who was the project director, Byron Wesley, a chemist with the State Police, testified in the court below that the final results showed 88 to 89% of the tests were within $+/- .03$ g/100 ml. (i.e. the suspect blew a .10 g 100m. on the PBT) and a .13 to .07 on the Breathalyzer 2000. The remaining 11 to 12% tested within .04 to .05. Thus we find that as a general proposition the Alco Sensor III is acceptable.

■ As to the particular machine used on appellant, again, we find, based upon the evidence, that it was in proper working order. In the first place, the Alco Sensor III has certain built-in safeguards for malfunction, but in the event something is out of order, it will show a lower alcohol reading which is to a suspect's advantage.

When used on Allen, it at first showed a .00 reading which meant the previous test had been purged and that it was ready to work properly. The particular machine had been used five to six times on the evening in question and had not had a positive reading until used on appellant. The operator further related that he calibrated the device as suggested by his instructors and that he had received the requisite training in its use. For that matter, the administering officer, Wayne Crumpton, testified that he had used the machine "on thousands of occasions" before testing Allen. Nothing indicates to us that anything was amiss with the Alco Sensor III used on appellant nor that the operator was not fully trained.

We fail to perceive the significance of appellant's reference to *Tipton v. Commonwealth*, Ky.App., 770 S.W.2d 239 (1989), wherein this Court referred to the "eyeball rule" which is nothing more than a section from the Chemical Test Manual for Kentucky which has no binding affect upon the judiciary. Even if it did the *Tipton* panel remarked that:

> However, so along as the officer can observe by a presence—sense perception of the arrestee the standard operating procedures are met. The circuit court correctly remarked that the operator need not stare at the arrestee for 20 minutes [the eyeball rule].

Again, *Tipton* is a breathalyzer case and this is an Alco Sensor III matter.

■ In concluding his attack on the PBT, Allen claims that the taking of his breath constituted an illegal search and that he was not given his rights. During the trial of this cause, appellant testified that he asked if he could get into the cruiser. In addition, Major Cintron, whose car it was, asked the suspect if he would submit to a PBT and was answered in the affirmative. At this time Allen was neither under arrest nor in the custody when he agreed to take the test. Therefore, when he points out that the conflict in the progeny of *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), seems to hinge on whether the suspect had

consented is of little aid to him because he consented. In addition, we find his argument has no merit for the taking of a blood test is merely a minor intrusion into a person and, accordingly, not unreasonable. *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). *See also Kuzmiak v. Flowers*, Ky., 580 S.W.2d 226 (1979).

As to the reading of the rights, since Allen was not in custody when the PBT was taken, then *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), has no application.

■ We believe we should remind those who have an interest in the prosecution and defense of driving under the influence of intoxicants cases that there has arisen a supposition that courts must rely upon the various devices, chemical or otherwise, upon which to base a conviction. These machines do not replace the observations and conclusions of an experienced officer who stops the offender for illegal operation of a vehicle. The attempts to discredit the technology may do just that, but a conviction may stand upon the testimony of the police without resort to the various devices.

■ Allen next addresses the blood alcohol test and makes complaint in three areas. Initially, he contends that the search warrant necessitated by his refusal to take the breathalyzer was not supported by probable cause in that it was couched upon what he says was the "inadmissible" PBT. Having heretofore determined that the evidence of the PBT was proper, then this argument must fail, and we need to treat the issue no further.

The blood alcohol test was conducted as they all are in that the technician first treated the area where the needle was to be inserted with alcohol. This, the appellant contends, could distort the results. There was ample evidence that the testing process and/or machine can differentiate between six types of alcohol. Moreover, the evidence indicated that an antiseptic type of alcohol differs from that found in blood which emanates from a beverage. The test did not reflect the presence of any of the antiseptic type. Based upon the

record, the blood test results were properly admitted.

Appellant claims constitutional error in that he was unable to have an independent test made of the blood sample because it was destroyed by the laboratory after a 38-day period. The prosecutor had no objection to such a test and even took steps to aid Allen in acquiring the same. Only after the request had been made did both the accused and the Commonwealth learn of the destruction pursuant to established policy of the lab. By this we mean there was no bad faith on the part of the prosecution. On the other hand, the testimony demonstrated that the testing procedures were reliable and the chain of custody maintained. *See Smith v. Commonwealth*, Ky., 722 S.W.2d 892 (1987). The fact that the destroyed evidence might have assisted appellant is as immaterial in this case as it was in *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988), wherein it was pointed out:

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

Again, we should mention that this charge against James Allen could have been proven without any of the technology used in the case.

The judgment is affirmed.

All concur.